**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

|  |  |
|---|---|
| **WSOU INVESTMENTS LLC D/B/A BRAZOS LICENSING AND DEVELOPMENT**, <br><br> *Plaintiff*, <br><br> v. <br><br> **ZTE CORPORATION, ZTE (USA) INC. AND ZTE (TX), INC.,** <br><br> *Defendants*. | C.A. NO. 6:20-cv-00490-ADA <br> C.A. NO. 6:20-cv-00491-ADA <br> C.A. NO. 6:20-cv-00493-ADA <br> C.A. NO. 6:20-cv-00497-ADA |

**DEFENDANTS' SUR-REPLY CLAIM CONSTRUCTION BRIEF**

## <u>TABLE OF CONTENTS</u>

I.  U.S. PATENT NO. 7,203,505 (CASE NO. 6:20-CV-00497-ADA) ..................................1

  A.  Disputed Term 1: "a formatter to format the received data into at least one SMS (Short Message Service) message" "formatting" / "formatter to format" (Claims 1, 14, and 23) ......................................................................1

    1.  This Term is Subject to 35 U.S.C. §112(f) .................................................1

    2.  The '505 Patent Specification Fails To Describe The "Formatter"............2

  B.  Disputed Term 2: "data message receiver" (Claim 14) ...........................................3

  C.  Disputed Term 3: "SMS (Short Message Service)" (Claims 1, 14, and 23)............4

II.  U.S. PATENT NO. 8,179,960 (CASE NO. 6:20-CV-00490-ADA) ..................................5

  A.  Disputed Term 1: "virtual reference" (Claims 1, 2, 3, 9, 10, 15-17, 23, and 24) ...............................................................................................................5

  B.  Disputed Term 2: "does not represent any portion of any individual frame of the original video signal" (Claims 1, 9, 15, and 23)............................................6

  C.  Disputed Term 3: "minimize differences" (Claims 3 and 17) ................................6

III.  U.S. PATENT NO. 8,730,905 (CASE NO. 6:20-CV-00491-ADA) ..................................8

  A.  Disputed Term 1: "during a time interval between data transmission intervals during the transmission period" (Claims 4 and 15) .................................8

  B.  Disputed Term 2: "at least one frequency channel indicator" (Claims 5 and 16) .................................................................................................................9

  C.  Disputed Term 3: "causing the transmission of the reservation message on each frequency band separately" (Claims 9 and 21)..............................................10

    1.  "Different *times*" for transmitting different reservation messages ...........10

    2.  "Different *frequency bands*" for transmitting different reservation messages ......................................................................................................10

    3.  "Different *PLCP and MAC headers*" for different reservation messages ......................................................................................................11

IV.  U.S. PATENT NO. 9,294,060 (CASE NO. 6:20-CV-00493-ADA) ................................12

  A.  Disputed Term 1: "extracting a feature vector" (Claims 1 and 10) ......................12

**Page**

    B.       Disputed Term 2: "level value is attenuated" (Claims 1 and 10) .........................13

    C.       Disputed Term 3: "spectral shape parameter" (Claims 1 and 10) .......................14

V.     CONCLUSION..............................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018)...................................................................14

*Halliburton Energy Servs. V. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008)...............................................1, 6, 11, 13, 14

*Nautilus Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014).......................................................................................9

*Novo Indus., L.P. v. Micro Molds Corp.*,
   350 F.3d 1348 (Fed. Cir. 2003)..................................................................9, 11

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...................................................1

*Secor View Techs. LLC v. Nissan N. Am., Inc., No. 12-3306 (FSH)*,
   2013 WL 6147788 (D.N.J. Nov. 21, 2013) ...............................................14

*Toshiba Corp. v. Imation Corp.*,
   681 F.3d 1358, 1369 (Fed. Cir. 2012)........................................................15

*Widevine Techs., Inc. v. Verimatrix, Inc.*,
   2009 WL 3734106 (E.D. Tex. 2009) ...........................................................2

**Statutes**

35 U.S.C. § 112(a) ...............................................................................................3

35 U.S.C. § 112(b) ...............................................................1, 3, 6, 8, 9, 12, 13

35 U.S.C. § 112(f)...........................................................................................1, 2

I.      **U.S. Patent No. 7,203,505 (Case No. 6:20-cv-00497-ADA)[1]**

    A.      **Disputed Term 1: "a formatter to format the received data into at least one SMS (Short Message Service) message" "formatting" / "formatter to format" (Claims 1, 14, and 23)**

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Governed by 35 U.S.C. § 112(f)<br>Function: formatting the received data into at least one SMS (Short Message Service) message<br>Indefinite under 35 U.S.C. § 112(b); specification fails to describe it<br>Structure: none disclosed." |

    1.      **This Term is Subject to 35 U.S.C. §112(f)**

The prosecution history of the '505 patent confirms that the claimed "formatting" term is subject to 35 U.S.C. § 112(f) and is not generic, nor well-known function of a mobile phone. For example, during prosecution of the '505 patent, in response to the Office Action dated December 16, 2004, the Applicant vehemently argued that "**formatting** of data to be synchronized into an SMS messages" is "a **fundamental feature of the present invention**." *See* ZTE Defendants Opening Brief, Ex. 13; Prosecution history, p. 72 (emphasis added). "The prosecution history is another tool to supply the proper context for claim construction because it demonstrates how the inventor understood the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).

And, as discussed below, WSOU fails to point out any structure necessary to perform the recited formatting function; and the formatting is not generic function of a mobile phone.

---

[1] As a preliminary matter, WSOU generally alleges that Defendants' filing of Inter Partes Review (IPR) petitions at U.S. Patent and Trademark Office (USPTO) indicate that the claims are not indefinite. This is incorrect. First, a claim is not definite merely because a party "can ascribe *some* meaning to a patent's claims." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2130, 189 L. Ed. 2d 37 (2014) (emphasis in original). Second, the PTAB has no jurisdiction to consider indefiniteness arguments in IPR proceedings. *See* 35 U.S.C. § 311(b). All pending IPR petitions expressly reserve the right to advance this very indefiniteness position in the litigation, so WSOU's complaints of inconsistency has little merit. And for each disputed issue, the IPR petitions adopt WSOU's proposed constructions and do not weigh in here on whether the respective terms are indefinite.

Therefore, a POSITA would not understand the structure of the "formatter" without disclosure of it in the specification. A POSITA would not even understand the claimed "formatter" is hardware or software. As such, the claims defeat "the public notice function of patent claims." *Halliburton Energy Servs. V. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

Further, courts have previously recognized that these similar terms connote functions, not structure. *See Widevine Techs., Inc. v. Verimatrix, Inc.*, 2009 WL 3734106, at *14-15 (E.D. Tex. 2009) (finding (1) "receiving a packet," (2) "examining a payload portion of the packet …," (3) "communicating the selectively encrypted portions over the network in a packet"; (4) "receiving the communicated packet"; and (5) "parsing the received packet …" to be functions that lacked algorithmic support). Therefore, the terms "formatter" and "formatting" should be construed as means-plus-function terms under 35 U.S.C. § 112(f) and indefinite under 35 U.S.C. § 112(b).

### 2. The '505 Patent Specification Fails To Describe The "Formatter".

In reply, WSOU reiterates and alleges that the '505 patent specification discloses the structure for the claimed "formatter." However, the portions cited by WSOU merely describe *generic SMS function* of a mobile terminal, WSOU Reply Brief, pp. 1-2, but not the recited function–*formatting a received message data into an SMS message*. This recited formatting is not generic SMS function of a mobile terminal, as discussed below.

First, WSOU provides portions such as "a mobile terminal device comprising," that "[m]odern-day mobile terminals, such as mobile telephones, have been provided with the SMS (Short Message Service) capability," and that "[i]t is noted that SMS standards provide for sending multiple short messages which are combined by the recipient," and argues that these portions show that the SMS standard was well known at the time of the invention. WSOU Reply Brief, pp. 1-2. WSOU is incorrect. The full specification, for context, does not disclose that "formatting" is a generic function of a mobile terminal. *See* the '505 patent, 1:64-2:17. Rather, the '505 patent

2

specification discloses that the generic, well-known SMS standard only allows a mobile terminal to send a message to an SMS center, and the SMS center handles and manages the SMS message, and forwards the SMS the message to the recipient. That is, the formatting is done *by the SMS message center*. The '505 patent claims, however, require that the formatting is performed by *a mobile terminal* and the mobile terminal transmits the formatted SMS message to the recipient. Therefore, the claimed formatting is not generic SMS function of a mobile terminal, and yet, the '505 patent specification does not disclose any structure necessary to perform the function of the formatter. One skilled in the art would not know whether the "formatter" is hardware or software.

Second, WSOU also alleges that the "SMS programming in the mobile terminal" mentioned in the '505 patent specification confirms SMS formatting capability. WSOU Reply Brief, p. 2. WSOU is incorrect. The full references specification disclosure, '505 patent, 4:23-31, merely discloses that the SMS programming provides capability of increasing the size of the message provision. However, the '505 patent specification does not disclose that the SMS programming performs the recited function of the "formatter", i.e., formatting the received data into at least one SMS message. Therefore, WSOU is incorrect.

Third, WSOU further alleges that the "SMS protocol" mentioned in the '505 patent specification confirms SMS formatting capability. WSOU Reply Brief, p. 2. WSOU is incorrect. Again, the full referenced disclosure, '505 patent, 4:46-52, discloses a SMS protocol, not a structure. It is well-known in the art that a protocol is a set of rules that govern communications on a network. An SMS protocol is just a set of rules but not a structure that necessary to perform the function of the formatter. Therefore, WSOU did not and cannot point out a portion of the '505 patent specification that discloses a structure necessary to perform the function of the formatter.

### B.      Disputed Term 2: "data message receiver" (Claim 14)

Defendants notified the Court and WSOU the withdrawal of claim construction for this

term. Thus, the dispute is moot.

### C.     Disputed Term 3: "SMS (Short Message Service)" (Claims 1, 14, and 23)

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Cellular based messages of limited size consisting of text and numbers." |

First, contrary to WSOU's allegation (WSOU Reply Brief, p. 4), Defendants did not admit that no construction is necessary for this term. The problem with the WSOU's allegation is that WSOU mistakenly considers the "cellular-based" feature of an SMS message as *all* the features that an SMS message has. The "cellular-based" feature is only one aspect of an SMS message. An SMS message also have some other features, for example, size limitation, type of data, etc. The '505 patent specification also describes such features. For example, "SMS allows a single short message of **up to one hundred sixty characters** of **text** in length to be sent from a sender to a recipient." The '505 patent, 2:1-3 (emphasis added). Therefore, WSOU's understanding of SMS message is incorrect and WSOU's argument is also incorrect.

Second, in its Reply Brief, WSOU admits that it is uncontested that an SMS message is "cellular-based." WSOU Reply Brief, p. 4. However, contrary to this admission, WSOU also raises objection to Defendants' "cellular-based" construction. In particular, WSOU first alleged that "Defendant's proposed construction is vague and confusing. For example, it is unclear what Defendant intends as to a "cellular based message[]."" WSOU Opening Brief, p. 8. WSOU now alleges that "Defendant's intention as to "cellular-based" is still confusing." WSOU Reply Brief, p. 5. This contradiction further confirms that claim construction is necessary here.

For instance, in WSOU's strawman argument it argues that Defendants "expressly contradict [their] own contention that SMS messages are exclusively cellular-based." WSOU Reply Brief, p. 5. This argument, however, is a poor attempt for WSOU to confuse an SMS center

and a cellular/IP network gateway. A SMS center is not a gateway that converts an SMS message into an IP-based message. An SMS center handles and manages SMS messaging but it is still in a cellular network. It has nothing to do with a gateway. Additionally, an SMS message can be transmitted within a cellular network without converting into an IP message, for example, between two mobile terminals via an SMS center. An SMS message can also be transmitted between a mobile network and a server computer by converting the SMS message into an IP message by a cellular/IP network gateway (as shown in the annotated FIG. 1 of the '505 from ZTE Defendants' Opening Brief, p. 12). An SMS center may also be involved in this process, and because of the existence of these different paths of transmissions and different types of data compatible to different networks, construction of the term is necessary.

## II.    U.S. Patent No. 8,179,960 (Case No. 6:20-cv-00490-ADA)

### A.    Disputed Term 1: "virtual reference" (Claims 1, 2, 3, 9, 10, 15-17, 23, and 24)

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a group of pixels (e.g., a block) that is used as reference material for encoding portions of the video signal (e.g., a motion-compensated inter-predicted block), but that does not comprise or represent any portion of the actual video sequence to be displayed. | A group of pixels used as reference material for encoding portions of the video signal, but that does not comprise or represent any portion of the actual video sequence to be displayed. |

As previously addressed in Defendants' Opening Brief, the construction of this term "virtual reference" should not include "a block" or "a motion-compensated inter-predicted block" from the specification because independent claims (i.e., claims 1, 9, 15, and 23) do not limit the "virtual reference" to a block. In fact, the independent claims do not recite *any* block, and the claimed "virtual reference" can be a group of blocks, a slice, or a frame, rather than a block.

5

**B.      Disputed Term 2: "does not represent any portion of any individual frame of the original video signal" (Claims 1, 9, 15, and 23)**

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Data generated based on a portion of a video signal but not to be displayed with the video signal." |

WSOU argues that the full claim phrase provides all of the context and requirements necessary and alleges that Defendants provide nothing for support their arguments. WSOU Reply Brief, p. 6.   WSOU is incorrect. As discussed in Defendants' Opening Brief, p. 15, there are different interpretations for the term even in view of the full claim phrase.

Because the scope of the claims is not "sufficiently definite to inform the public of the bounds of the protected invention," the claims defeat the public notice function and the claims should be found invalid. *Halliburton Energy Servs. V. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008). Therefore, WSOU is incorrect, and claim construction is required here.

**C.      Disputed Term 3: "minimize differences" (Claims 3 and 17)**

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Indefinite under 35 U.S.C. § 112(b)." |

The term is a term of degree, but the '960 patent fails to provide the standard for minimizing the claimed differences. WSOU did not dispute that the term "minimize differences" is a term of degree. WSOU Reply Brief, pp. 7-8. However, WSOU argues that the specification provides a standard for measuring that degree. *Id*. WSOU is incorrect.

The critical point that WSOU fails to address is that specification disclosures—even the ones cited by WSOU—are detached from the claims. The disclosed "differences" from the specification disclosures are completely different from the "differences" recited in the claims – differences between said identified video blocks and the generated virtual reference data.

WSOU randomly points to *any* "differences" mentioned in the specification, rather than the specifically claimed "differences." Therefore, WSOU fails to provide a portion of the specification that describes ***the standard for minimizing the differences*** — differences between the identified video blocks and generated virtual reference data, as recited in the claims. Indeed, the claims and specification do not give any indication as to how to determine when the difference between said identified video blocks and the generated virtual reference data is minimized.

First, WSOU references video coding standards as allegedly disclosing minimizing differences. WSOU Reply Brief, pp. 7-8. WSOU points to two paragraphs of the Background section. The '960 patent, 1:15-34. The first paragraph is merely an introductory description regarding the well-known block-based, motion-compensated prediction scheme of standard video codecs. However, the video coding standards have nothing to do with *minimizing differences* between identified video blocks and generated virtual reference data because the description does not provide any guidance regarding how to determine the minimal difference between the identified video block and generated virtual reference data. The second paragraph is merely a general description about block-based coding, i.e., intra-coding and inter-coding.

Second, the "differences" WSOU references from the specification are completely different from the "differences" recited in the claims. In particular, the "differences" mentioned in the second paragraph, the '960 patent, 1:15-34, is "differences between the reference and the **block to be coded**" in inter-coding scheme, which is known as "error term" or "prediction error" in the art. On the other hand, the "differences" recited in the claims are "differences between said **identified video blocks** and the generated virtual reference data." According to the '960 patent specification, the identified video blocks of the claims are not the blocks to be coded. As such, the

specification fails to provide support for minimizing the difference between *the identified video blocks* and the *generated virtual reference data* as claimed.

Third, the same holds true for WSOU's referenced H.264 disclosure—that it fails to disclose the claimed "differences". The '960 patent, 3:62-4:11. This paragraph merely describes the general feature of the H.264 standard encoder. In particular, the "difference" mentioned in this paragraph is a "difference between the discrete cosine transform (DCT) coefficients of the predicted pixels and the DCT coefficients of the actual pixels." This difference is quantized to serve as the error, and the encoding is more efficient if this difference is equal to zero. However, this "difference" is not the same claimed "difference." As such, this paragraph is completely irrelevant for determining the standard for minimizing differences between the identified video blocks and the generated virtual reference data, and does not describe what is the minimal difference between the identified video blocks and the generated virtual reference data.

### III.     U.S. Patent No. 8,730,905 (Case No. 6:20-cv-00491-ADA)

#### A.     Disputed Term 1: "during a time interval between data transmission intervals during the transmission period" (Claims 4 and 15)

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Indefinite under 35 U.S.C. § 112(b)." |

WSOU argues that the claim language itself is fully descriptive, and that the specification also provides exemplary embodiments. WSOU Reply Brief, p. 9. WSOU is incorrect.

For instance, WSOU argues that FIG. 3 illustrates that the reservation response message ("OK") is transmitted and received in a time period during the transmission period (TXOP) and between data transmission intervals (DATA). This is incorrect as already explained in ZTE Defendants' Opening Brief, p. 20. The overlap between the time intervals and data transmissions creates ambiguities for this term. For example, if the reservation response message ("OK") is

transmitted and received during the time interval 3 (e.g., long pink arrow from annotated Fig. 3, Defendants' Opening Brief), the OK message can be transmitted during data transmission interval 2 (e.g., horizontal blue block), because the data transmission interval 2 is within the time interval 3. Therefore, a POSITA would not understand whether the OK message is transmitted and received during a data transmission interval or during a time interval between data transmission intervals.

The problem with WSOU's arguments is that WSOU completely ignores, without providing any reasoning, the existence of the data transmission interval 2 within the time interval 3, which causes ambiguity of the claim. Therefore, the term is "not amenable to construction" without a speculation or a blind guessing, and thus the term is indefinite. *See Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1353 (Fed. Cir. 2003).

B.     **Disputed Term 2: "at least one frequency channel indicator" (Claims 5 and 16)**

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Indefinite under 35 U.S.C. § 112(b)." |

WSOU argues that the plain language of the claim itself provides that the "at least one frequency channel indicator" is an indicator of at least one additional frequency band. WSOU Reply Brief, p. 10. WSOU is incorrect.

As explained in Defendants' Opening Brief—which WSOU catastrophically fails to address—according to the claim language, the 'at least one' can specify the 'frequency channel', alternatively, can specify the 'indicator.' Defendants' Opening Brief, pp. 21-22. WSOU's Reply Brief fails to address the ambiguity of the "at least one" modifier.

Therefore, the claims, even if read in light of the intrinsic record, fail to inform those skilled in the art about the scope of the invention with reasonable certainty. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

### C. Disputed Term 3: "causing the transmission of the reservation message on each frequency band separately" (Claims 9 and 21)

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Indefinite under 35 U.S.C. § 112(b)." |

WSOU argues that that this term should be given its plain and ordinary meaning. However, as discussed below, the portions WSOU cites for its arguments introduce more ambiguity to the claims. WSOU Reply Brief, pp. 10-12.

For instance, according to WSOU's reply arguments, the term—in particular the "separate" term—can be construed at least the following *three different ways*—all of which remove clarity from the claimed term.

#### 1. "Different *times*" for transmitting different reservation messages

WSOU cites the following portion of the specification:

> In the embodiments of FIGS. 3 and 4, the reserving STA is configured to reserve the channels by transmitting the reservation messages individually on the channels being reserved (**one reservation message at a time**).

The '905 patent, 10:20-23 (emphasis added), and FIGs. 3 and 5.

These citations, as referenced by WSOU, suggest that the term "separately" means different times for transmitting different reservation messages, i.e., one reservation message at a time, as shown in FIG. 3 of the '905 patent. In particular, as shown in FIG. 3, the three reservation messages (RES) are transmitted at different times. The opposite feature is shown in FIG. 5, where the two reservation messages RES are transmitted at the same time.

#### 2. "Different *frequency bands*" for transmitting different reservation messages

WSOU also argues that "Figures 3 and 5 (reproduced below) illustrate the above embodiments, where the reservation messages (RES) are transmitted one at a time (Figure 3), and

where the reservation messages are transmitted concurrently (Figure 5), but in both cases, the reservation messages *are transmitted on each frequency band separately*." WSOU Reply Brief, p. 11 (emphasis added). Thus, WSOU further argues that the term "separately" does not mean different times, rather, the term means <u>different frequency bands</u> at which corresponding different reservation messages are transmitted.

### 3. "Different *PLCP and MAC headers*" for different reservation messages

WSOU also cites the following portion of the specification:

> In the embodiment of FIG. 5, the reserving STA is configured to transmit the reservation messages concurrently on a plurality of channels that are to be reserved. Accordingly, each reservation message comprises **separate PLCP and MAC (Medium Access Control) headers**. An advantage of providing **separate messages**, e.g. 20 MHz bandwidth, is that even those communication apparatuses supporting only IEEE 802.11a are able to receive the reservation messages and apply the NAV setting.

The '905 patent, 10:23-31 (emphases added).

Thus, according to this citation, the term "separately" means separate PLCP and MAC headers for the reservation messages. That is, each of multiple reservation messages has different PLCP and MAC headers.

WSOU attempts to cure the error made in drafting but WSOU's arguments introduce more ambiguity. Therefore, the term is "not amenable to construction" without a speculation or a blind guessing, and thus the term is indefinite. *See Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1353 (Fed. Cir. 2003). Because the scope of the claims is not "sufficiently definite to inform the public of the bounds of the protected invention," the claims defeat the public notice function and the claims should be found invalid. *Halliburton Energy Servs. V. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

## IV.    U.S. Patent No. 9,294,060 (Case No. 6:20-cv-00493-ADA)

### A.    Disputed Term 1: "extracting a feature vector" (Claims 1 and 10)

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Indefinite under 35 U.S.C. § 112(b)." |

WSOU alleges that the specification expressly teaches how to extract a feature vector from the audio signal. WSOU Reply Brief, p. 12. WSOU is incorrect.

The '060 patent specification merely states extracting a feature vector from an audio signal but fails to explain what the recited "extracting a feature vector" means. It is not possible to determine whether the term means computing a feature vector or extracting a computed feature vector, and thus, the scope of the claims is not sufficiently definite. WSOU cites multiple portions of the '060 patent specification, but none of them answers the question, as discussed below.

First, WSOU argues that the specification provides support for a plurality of frequency components. WSOU Reply Brief, p. 13; *see also* '060 patent, 2:14-15, Abstract, 29:4-5 (Claim 1), 30:15-17 (Claim 10). The issue here, however, is not whether a feature vector comprises a frequency domain component and/or a time domain component feature vector. The issue here is whether the claimed "extracting" means "extracting computed feature vector" or "computing feature vector." Therefore, WSOU is incorrect.

Second, WSOU also argues that the specification provides support for time domain and frequency domain features. WSOU Reply Brief, p. 13; *see also* '060 patent, 10:39-12:27. It is important to note that the claims do not recite "the feature extractor," rather "extracting a feature vector." For instance, the referenced sections WSOU points to are irrelevant as either disclosing mapping during signal processing *after* the claimed extraction, or generating sub-band signals *after* the claimed extraction.

Third, WSOU argues that the specification discloses a feature extractor. WSOU Reply

Brief, p. 13; *see also* '060 patent, 12:29-13:16. As addressed above, however, the claims do not recite the feature extractor. Additionally, this citation merely describes a type of frequency domain feature - a centroid of the frequency domain signal, and fails to teach how to extract a feature vector from the audio signal.

Fourth, WSOU also argues that the feature extractor comprises time domain feature components. WSOU Reply Brief, p. 13; *see also* '060 patent, 13:16-14:52. Like above, this citation merely describes types of time domain feature component − gradient index, energy ratio, and voice activity, but still does not clarify the issue.

WSOU provides numerous citations from the '060 patent specification but none of them explains the meaning of the term. A POSITA would not understand whether the "extracting a feature vector from the audio signal" means extracting an already computed feature vector from the audio signal or computing a feature vector using the audio signal.

The scope of the claims largely depends on the construction of the term. Because the scope of the claims is not "sufficiently definite to inform the public of the bounds of the protected invention," the claims defeat the public notice function and the claims should be found invalid. *Halliburton Energy Servs. V. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

### B.      Disputed Term 2: "level value is attenuated" (Claims 1 and 10)

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Indefinite under 35 U.S.C. § 112(b)." |

First, WSOU argues that plain language of the claims themselves provide that the sub band energy level is reduced when the power of the audio signal approaches an estimate of the level of noise in the audio signal. WSOU Reply Brief, p. 14. WSOU is incorrect.

WSOU incorrectly references the specification. The '060 patent, 17:34-40 and 18:8-46. The referenced sections merely describe the attenuation technique, band energy smoother, which

is merely a tool for attenuation. These specification citations do not explain the standard for attenuation. For instance, it is unclear whether 1% attenuation of the sub band energy level satisfies the claimed attenuation, or whether only 99% attenuation of the sub band energy level is the claimed attenuation—or somewhere in between such as 20% or more attenuation can be considered as the attenuation.

Second, WSOU also argues that the term "attenuation" is not a degree, and all that is required is an attenuation. In other words, by the plain language of the claims, and in light of the specification, any attenuation is sufficient to satisfy this term." WSOU Reply Brief, p. 14. WSOU is incorrect.

The attenuation can only be detected by measuring. However, the '060 patent specification does not provide **standards** for measuring the attenuation. Because the '060 patent fails to provide standards to guide a skilled artisan on the meaning of "the sub band energy level value is attenuated when the power of the audio signal approaches an estimate of the level of noise in the audio signal," it is insolubly ambiguous, rendering the phrase indefinite. *See*, *Secor View Techs. LLC v. Nissan N. Am., Inc., No. 12-3306 (FSH)*, 2013 WL 6147788, at 4 (D.N.J. Nov. 21, 2013); *see* also *Halliburton Energy Servs., Inc. v. M–I LLC,* 514 F.3d 1244, 1249-50 (Fed. Cir. 2008); *see* also *Berkheimer v. HP Inc.,* 881 F.3d 1360, 1363-64 (Fed. Cir. 2018).

Third, WSOU further argues that the specification includes an exemplary embodiment. The '060 patent, 18:36-40; *see also* WSOU Reply Brief, p. 15. WSOU is incorrect. This citation merely describes that the attenuation occurs according to the difference between the energy but does not disclose the standard for measuring attenuation.

### C.    Disputed Term 3: "spectral shape parameter" (Claims 1 and 10)

| WSOU's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
|  |  |

| Plain and ordinary meaning | "A sub band energy level value or a sub band gain factor based on the sub band energy level value" |

WSOU argues that the claimed spectral shape parameter should not be limited to a sub band energy level value or a sub band gain factor based on the sub band energy level value. WSOU Reply Brief, p. 15. WSOU is incorrect. As discussed in ZTE Defendants' Opening Brief, the '060 patent only discloses two types of spectral shape parameters—sub band energy level and sub band gain factor. Thus, Defendants' proposed construction is based on the '060 patent specification in which the claims are construed in context of.

WSOU also argues that "[a]bsent disclaimer or lexicography, the plain meaning of the claim controls," based on the holding of *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369 (Fed. Cir. 2012). WSOU Reply Brief, p. 15. WSOU is incorrect. *Toshiba*[2] does not apply here because the facts are completely different. Unlike *Toshiba*, here, the '060 patent specification does not disclose *any* spectral shape parameter other than the sub band energy level value and the sub band gain factor. WSOU also fails to provide any name of purported additional spectral shape parameters. Thus, WSOU attempts to expand the scope without a boundary and courts did not allow such improper expansion of the scope of the claims. Therefore, this Court should not allow such improper expansion of the scope of the claims.

## V.    CONCLUSION

For the foregoing reasons, Defendants request that the Court adopt Defendants' proposed constructions.

---

[2] In *Toshiba*, Appellees argued that the DVD recited must be limited to two-sided discs while the patent specification clearly describes that "DVDs may be one-sided or two-sided." *Toshiba* at 1366. Appellees did not argue that there was a disclaimer limiting the scope of claim 1 or the patentee acted as its own lexicographer. Therefore, the Court stated that "[a]bsent disclaimer or lexicography, the plain meaning of the claim controls." *Toshiba* at 1369.

DATED:  May 7, 2021                    Respectfully submitted,

*/s/Lionel M. Lavenue*
Lionel M. Lavenue
Virginia Bar No. 49,005
lionel.lavenue@finnegan.com
**FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP**
1875 Explorer Street, Suite 800
Reston, VA 20190
Phone:  (571) 203-2700
Fax:      (202) 408-4400

**ATTORNEY FOR DEFENDANTS**

16

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have

consented to electronic service are being served with a copy of this document via the Court's

CM/ECF system on May 7, 2021.

*/s/Lionel M. Lavenue*
Lionel M. Lavenue
